1  James G. Gilyard (220791)
2  LAW OFFICE OF JAMES G. GILYARD
   8 Birdsong Lane
3  El Sobrante, Ca 94803
   Telephone No.: (510) 253-3560
4  Fax No. (510) 779-6685
   jgilyard@gilyardlaw.com
5
6  Attorney for Plaintiffs

**FILED**

E-filing    MAR 2 4 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**JSW**

9
10  **UNITED STATES DISTRICT COURT**
11  **NORTHERN DISTRICT OF CALIFORNIA**
12  **(SAN FRANCISCO)**

**CV 09    1272**

13  Florence Stean, Ignatius Russo, Dorothy L.
14  Turner, Babatunde White, Karen Fomby, Febe
    Natividad, Marlyn LaCanlale, Glenn Ancheta,
15  Ray Jefferson, Abraham Chua and Ramzy
    Munir Haddadin  individually and on Behalf of
16  All Others Similarly Situated,

                    Plaintiffs,
18
         vs.
19
    Wells Fargo & Company, First Franklin Loan
20  Services, Consumer Solutions, REO LLC
    ("REO"), New Century TRS Holdings, Inc.
21  ("New Century"), Barclays Capital Real Estate
    Inc. d/b/a HomEq Servicing d/b/a The Money
22  Store, Inc., IndyMac Bank, FSB, Lehman
    Brothers Holdings Inc. d/b/a Aurora Loan
23  Services LLC, First Federal Financial
    Corporation d/b/a First Federal Bank of
24  California, Homecomings Financial USA
    Corporation, Litton Loan Servicing, LP,
25  GMAC Mortgage, LLC and DOES 1 through
26  100 inclusive,
27
                    Defendants.

) CLASS ACTION
)
) COMPLAINT FOR:
) (1) DECLARATORY RELIEF;
) (2) BREACH OF CONTRACT AND THE
)     IMPLIED COVENANT OF GOOD
)     FAITH AND FAIR DEALING;
) (3) VIOLATION OF SECTIONS 1709, 1710
)     AND 1711 OF THE CALIFORNIA
)     CIVIL CODE;
) (4) FRAUD, DECEIT AND
)     MISREPRESENTATION;
) (5) VIOLATIONS OF HOME OWNERSHIP
)     EQUITY PROTECTION ACT;
) (6) VIOLATIONS OF CALIFORNIA
)     FINANCIAL CODE SECTION
)     22302(b) AND CALIFORNIA CIVIL
)     CODE SECTION 1670.5;
) (7) VIOLATION OF CALIFORNIA CIVIL
)     CODE SECTION 2923.6;
) (8) VIOLATION OF CALIFONIA
)     BUSINESS AND PROFESSIONS;
)     CODE SECTIONS 17200, ET SEQ.;
) (9) UNJUST ENRICHMENT/COMMON
)     LAW RESTITUTION

COMPLAINT                                          1

1

### DEMAND FOR JURY TRIAL

)

2

3

4     1.     Plaintiffs Florence Stean, Ignatius Russo, Karen Fomby, Babatunde White, Ray

5     Jefferson, Dorothy L. Turner, Febe Natividad, Marlyn LaCanlale, Glenn Ancheta, Abraham

6     Chua, and Ramzy Munir Haddadin bring this consumer protection class action individually, and

7     on behalf of all similarly situated purchasers of "high cost" sub-prime adjustable rate mortgage

8     ("ARM") products from First Franklin Loan Services, ("First Franklin"), Consumer Solutions,

9     REO LLC ("REO"), New Century TRS Holdings, Inc. ("New Century"), Wells Fargo &

10    Company ("Wells Fargo"), Morgan Stanley Capital I Inc. ("Morgan Stanley"), Barclays Capital

11    Real Estate Inc. ("Barclays") d/b/a HomEq Servicing ("HomEq"), The Money Store, Inc. ("The

12    Money Store"), IndyMac Federal Bank, FSB ("IndyMac"), Lehman Brothers Holdings Inc.

13    ("Lehman Brothers") d/b/a Aurora Loan Services, LLC ("Aurora"), First Federal Financial

14

15    Corporation ("First Fed") d/b/a First Federal Bank of California, Homecomings Financial USA

16    Corporation ("Homecomings"), Litton Loan Services ("Litton"), GMAC Mortgage, LLC

17    ("GMAC") and their agents, predecessors and successors in interest (collectively,

18    "defendants") between March 10, 2005 and the present (the "Class Period") against defendants

19

20    for declaratory relief, breach of contract, fraud, violations of the Home Ownership Equity

21    Protection Act ("HOEPA"), Cal. Civ. Code §§1709, 1710 and 1711, California Financial Code

22    §22302(b), Cal. Civ. Code §1670.5, California Civil Code §2923.6 and California's Unfair

23    Competition Law ("UCL"). Plaintiffs make the following allegations upon information and

24    belief based on a reasonable investigation under the circumstances, except as to those allegations

25    pertaining to plaintiffs, which are alleged on personal knowledge.

26

27

28

COMPLAINT                                    2

## SUMMARY AND OVERVIEW

2.      This action arises out of defendants' egregious, ongoing and far reaching fraudulent "high cost" mortgage scheme by which, as described further herein, they devised a business plan to reap millions of dollars in unearned profits during the Class Period by deceiving plaintiffs and other homeowners about the material terms, conditions and benefits associated with certain "high cost" sub-prime mortgage products, in violation of state and federal law.

3.      Specifically, defendants have engaged in a systematic and widespread predatory lending scheme of offering substantially inferior mortgage products to elderly, minority and financially impaired consumers with no intention that the loan could ever be re-paid by the homeowner and—in some cases—knowingly and intentionally transferring or destroying the original notes in a manner designed to conceal the inferior quality of the mortgages for securitization purposes. "In the Ninth Circuit, entering into an agreement 'with the secret reservation not to fully perform it' is cognizable fraud." *Sharp v. Hawkins*, No. C 03-5023 CW, 2004 U.S. Dist. LEXIS 22928, at *13 (N.D. Cal. Nov. 5, 2004) (quoting *Walling v. Beverly Enters.*, 476 F.2d 393, 396 (9th Cir. 1973)):

> National Community Reinvestment Coalition ("NCRC") recently released a study that that found that neither credit nor income levels protected minority borrowers from being disproportionately targeted by high-cost loans. In fact the study indicates that racial differences in lending increase with income levels. In other words, middle-and upper-income minorities are more likely to receive high priced loans than their similar white counterparts than are low-and-moderate-income minorities compared to their white counterparts.
>
> African Americans of all income levels were twice as likely or more than twice as likely to receive high-cost loans as were whites in 171 metropolitan statistical areas ("MSAs") in data collected in 2005; middle-to-upper income African-Americans had the same probability in 167 MSAs. However, lower-to-middle-income African Americans were twice or more than twice as likely to receive those high cost loans in only 70 MSAs.

COMPLAINT                                    3

1    Hispanics also suffered the same disparities; low-to-middle-income Hispanics
     were two or more times more likely than comparable whites to receive high-cost
2    loans in 10 MSAs while middle-to-upper income Hispanics were twice as likely
3    to receive high-cost loans in 75 MSAs

4    The study also found disparities in lending to Asian Americans.

5    In court documents filed in the U.S. District Court for the Central District of
6    California the NAACP charged that the lending industry has a long history of
     discrimination in connection with mortgage loans made to African-Americans and
7    that the Federal Reserve Board had recently concluded that African Americans
8    were more likely to pay higher prices for mortgages than their Caucasian peers. In
     addition to higher interest rates the suit alleged that subprime loans to African-
9    Americans are *"typically laden with improperly disclosed fees, including
     excessive prepayment penalties which effectively prohibit borrowers from
10   refinancing at a fairer rate."* The suit quotes the Center for Responsible Lending
11   estimates that families lose 2.3 billion each year from their home equity wealth
     because of prepayment penalties in subprime mortgage loans and that African-
12   Americans are more than three times as likely as Caucasians to be placed into one
13   of these subprime loans.

14   The NAACP also states that *"These statistical disparities are not mere
     happenstance, but instead result from a systematic and predatory targeting of
15   African Americans."*

16   4.      With respect to securitized notes, defendants can not identify either the trustee or

17   the true owner of the notes, or are otherwise unable to comply with federal rules requiring

18   joinder of such individuals to enforce them. *See See In re Kang Jin Hwang*, 396 B.R. 757, 764-
19
20   72 (Bankr. C.D. Cal. Sept. 29, 2008).

21   5.      Defendants' unlawful, unfair, and fraudulent business practices, caused plaintiff

22   and other similarly situated consumers to suffer injury in fact and to lose money and/or property

23   (in the form of excessive fees, interest rates or other charges) as a result of having reasonably

24   relied upon the defendants' representations about the terms conditions and quality of the
25
26   mortgages at issue. And, defendants have made millions in profits.

27   6.      Defendant First Franklin is a corporation organized under the laws of the State of

28   Georgia, with its principal place of business in San Jose, California. First Franklin is engaged in

COMPLAINT                                    4

1   the business of issuing subprime mortgage loans throughout California, and throughout the

2   United States, that violate the laws identified herein.

3       7.      Defendant Wells Fargo is a diversified financial services company and is based in

4

5   San Francisco, California. On information and belief, Wells Fargo is either the parent company

6   or otherwise affiliated with Barclays Capital Real Estate Inc. d/b/a HomEq Servicing d/b/a The

7   Money Store

8       8.      Wells Fargo is engaged in the business of issuing subprime mortgage loans

9

10  throughout California, and throughout the United States, that violate the laws identified herein.

11      9.      Defendant Lehman Brothers d/b/a Aurora Loan Services LLC is a corporation

12  organized under the laws of the State of Delaware, with its principal place of business in New

13  York, New York. On information and belief, Lehman Brothers is a subsidiary of defendant

14  Morgan Stanley. Lehman Brothers is engaged in the business of issuing subprime mortgage

15  loans throughout California, and throughout the United States, that violate the laws identified

16

17  herein.

18      10.     Defendant GMAC is organized under the laws of the State of Delaware, with its

19  principal place of business in Fort Washington, Pennsylvania. GMAC is engaged in the business

20  of issuing subprime mortgage loans throughout California, and throughout the United States, that

21  violate the laws identified herein.

22

23      11.     On information and belief, defendant IndyMac is a corporation organized under

24  the laws of the State of California, with its principal place of business in Pasadena, California.

25  IndyMac is engaged in the business of issuing subprime mortgage loans throughout California,

26  and throughout the United States, that violate the laws identified herein.

27

28

COMPLAINT                                    5

12.   Defendant First Fed is a corporation organized under the laws or the State of Delaware, with its principal place of business in Santa Monica, California. On information and belief, First Fed is the parent company of First Federal Bank of California. Through its subsidiary, First Fed is engaged in the business of issuing subprime mortgage loans throughout California, and throughout the United States, that violate the laws identified herein.

13.   Defendant Litton is a Residential Mortgage Special Servicer, Residential Mortgage Subprime Servicer, Residential Mortgage Servicer, and Residential Subordinate Lien Mortgage Servicer a organized under the laws or the State of Delaware, with its principal place of business in Houston, Texas. Litton is engaged in the business of issuing subprime mortgage loans throughout California, and throughout the United States, that violate the laws identified herein.

14.   The true names and capacities (whether individual, corporate, associate or otherwise) of the defendants DOES 1 through 100, inclusive, are unknown to plaintiff. Therefore, plaintiff sues these defendants by designating such defendants by fictitious names. When plaintiff ascertains the identities of such Doe defendants, the Complaint shall be amended to reflect their true names.

15.   Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that plaintiffs' damages as herein alleged were proximately caused by those defendants. Each reference in this complaint to "defendants" or a specifically named defendant refers also to all defendants sued under fictitious names.

16.   Throughout the class period, defendants knowingly and affirmatively *misrepresented* the most important measurement of the affordability of a mortgage product: *the total amount of each monthly installment on the loan relative to the borrowers' existing debt*

COMPLAINT                                6

1  *to income ratio.* Wall Street analysts relied on the accuracy of defendants' representations

2  regarding revenue earned from mortgage sales to determine whether the business was on track

3  and growing. More importantly for this case, consumers relied on defendants' representations to

4

5  determine whether to accept the loans.

6  17.    After the collapse of the real estate market and in a desperate attempt to divert

7  attention from the widespread severe damage caused by its predatory lending practices and to

8  maintain the artificially inflated interest income derived therefrom, defendants have

9  systematically refused to discuss loan modifications for identifiable struggling homeowners until

10

11  after they have defaulted on their loans.  By doing so, defendants increase their already

12  oppressive bargaining position, thus allowing them to force equally onerous modification terms

13  on the borrower under the threat of foreclosure.  In the unlikely event that defendants agree to

14  modify a mortgage prior to default, defendants only agree to terms that—in effect—keep the

15  status quo for an additional period of time and, thereafter, place the homeowners in the identical

16

17  situation for which they originally sought help.

18  18.    Defendants have also engaged in other anti-competitive predatory lending

19  practices designed to prevent borrowers from securing affordable loan products elsewhere,

20  despite having clearly prime credit scores.  Take for instance the following letter from an

21

22  employee of Wells Fargo Financial:

23          **Update of May 12, 2008**: This week from the mailbag, from inside Wells
24          Fargo Financial --

25          Subj: Attention Inner City Press
26          Date: 5/2/2008 2:10:09 P.M. Eastern Daylight Time
            From: [Name withheld upon request]
27          To: Inner City Press

28

COMPLAINT                                    7

1   |   I am currently a Wells Fargo Financial employee. I didn't know if
you would be interested or not but I have some interesting information you
2   may want to look into further. I've been with Wells Fargo Financial since
3   [redacted to preserve confidentiality of whistleblower]. I came right out of
school and landed what I thought was a great career with a great
4   company. Little did I know that I am actually a consumer lender in the
subprime mortgage industry. Our main product is our Real Estate
5   refinance which is subprime. The average rate is about 10.5%. My belief
6   is that wells fargo financial is now downsizing and have found a clever
way to lay off a lot of employees without getting into headlines as
7   officially laying people off. We have seen a huge decline over the last six
months. I come from a smaller state, last year around march of 2007 we
8   had 50-some full time selling employees. We are now down to 20-
9   some. People are leaving left and right and I am hoping to get out of here
by the end of summer. I am an assistant branch manager. I have two
10  points of interest that I would like to let you in on to see what your opinion
11  is about the situation.

12  [First Point Omitted for emphasis]

13  Point Number 2: Sub-Prime loans and Prime loans or (A-Paper Loans)

14
15      Our business model is confused. We are supposed to be subprime
lenders, we sell to customers with 620 or below fico scores, that is our
16  target market. Anyone who has been in a sales position knows that sales
is about persistence, hard work, and of course leads. Our lead base is
17  mainly retail sales finance accounts (ex: tractor supplies financing, heating
18  and cooling, carpet, furniture stores etc.) Most of these customers usually
finance with 12 months same as cash periods or 24 months same as cash
19  periods etc. Lately things are tight you basically have to have at least
somewhat decent credit to get approved for this financing. Somewhat
20  decent credit is above 620 fico score. Most of these retail sales accounts
are 700 credit score customers and so forth. Our job is to call these
21  customers and service those accounts and cross sell, credit cards, auto loan
22  refinancing to pay off credit cards, and most importantly real estate
restructuring. Taking the equity you have in your home to combo other
23  bills to put them into one ultimate loan with a lower payment and
hopefully an overall lower total payback (which is rare).
24
25      Most of these customers could go to their bank and do the same
thing at a much lower interest rate. Our company doesn't want us selling
26  prime loans because we don't make money on these loans. If we book a
loan and it ends up going prime we do not receive credit for it as a unit or
27  a loan. We do get paid 175 bucks for each prime loan we book but if you
do nothing but prime loans you will show no new money credit for these
28  loans and zero units thus making it look like you didn't do anything. As a

COMPLAINT                                        8

result you would be pipped and begin the process of termination. There is a way for us to keep a prime customer from going prime, if we can convince the credit grade A, no matter what the fico score it could be and 850, to take a loan over 91% of the total loan value (example 100k home value, 91k loan amount) it will not go prime.

The tricky part is this, we as team members do not know what rate the customer will qualify for, we have a matrix, every customer falls into a certain pricing non-prime grade meaning a 720 credit score can come up and it will show up as a 10% rate but if you go below 91% ltv it will show that it can be recommended for prime pricing.

Let me give you a recent example:

I had a 736 fico customer coming in wanting to do a 124k total loan on a home he just had appraised about 6 months ago for 137k. The appraisal itself was done by a friend of the customers to purposefully bring it down because the loan he was trying to complete was the result of a divorce. I still took the chance and put in the total value as 137k. At a 124k total loan his total interest rate quoted was 9.38%. He had no choice, because of the way he was paid the bank would not cash flow him but we are very conservative as well but we were able to legitamitly cash flow him for the loan. (wells fargo doesn't mess around when it comes to cash flowing loans, we get heavy documentation) We got an appraisal done (wells fargo also doesn't mess around when it comes to appraisals, we have absolutely no contact with the appraisers, we have a separate company that we pay to have the contact) the appraisal came back for 185k. So obviously at this point, it would be tough for me to get this loan up to 91% ltv. For me it was simple, i want to do the right thing but at the same time i have to book loans, they put pressure on you to book it subprime, i tried like hell to sell 91% loan and nearly succeeded. The customer ended up only taking an extra 15k which still kept it below the 91% required to keep it from going prime. Still at this point i am not able to disclose to the customer that all he had to simply do was take any loan under 91% and he would simply sign the final pricing disclosure showing a 9.38% rate but after a final review it will come back and give him a 5.5% -7% loan. I still had to sell with the customer having the intentions he would be getting a 9.38% rate. We sent up the final pricing disclosure it was recognized as prime and the customer ended up with a 5.5% fixed rate for 30 years to his surprise and glee. That turned out great, of course it looks like I never booked a loan. Second scenario would have been if the customer had agreed to take an extra 60k out putting him over the 91% ltv mark and thus keeping the loan at 9.38% for a 720 fico customer. We can never inform them of this until after they agree to a higher rate like that is what they are getting and they get a prime loan. If i would have booked this loan subprime in that particular month i would have received

COMPLAINT                                    9

1    over 1k in total bonus money. Instead, I didn't hit the mark required for
     bonus money and only received the 175k for booking a prime loan.
2

3            This is of course a Cover Your Ass scenario for wells fargo but
     believe me, it is not a good thing to book a prime loan, i had my district
4    manager yelling at me for not being able to sell the extra 60k because once
     it is prime it doesn't count for the branches records, or the districts record
5    or the regions record. No one gets credit.

6
             That is my fundamental reason for wanting to leave wells fargo
7    financial. I know we are in business to make money, but not at the
     expense of humanity.
8

9        19.    As an intended consequence of defendants' unlawful, unfair, and fraudulent

10   business practices, borrowers are routinely forced into default  often, followed by foreclosure

11   thus destroying their credit ratings and preventing any possibility of refinancing their loans with

12   other financial services institutions.  These unfair practices had and continue to have their

13

14   intended effect of maintaining defendants' inflated earnings and preventing loan attrition.

15       20.    Plaintiffs bring this action on behalf of themselves and on behalf of all current and

16   former customers who purchased "high cost" adjustable rate mortgage ("ARM") products from

17   defendants which  by their hidden terms—have or are scheduled to reset to unaffordable higher

18   interest rates.
19

20                           **JURISDICTION AND VENUE**

21       21.    This court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA").

22   CAFA provides that district courts shall have original jurisdiction of class actions where the

23   proposed plaintiff classes contain 100 or more members, 28 U.S.C. §1332(d)(5), the aggregated

24   amount in controversy exceeds $5 million, and at least one member of the plaintiff class is

25   diverse from at least one defendant. 28 U.S.C. §1332(d)(2).

26       22.    Venue is proper in this Court pursuant to 28 U.SC. §1391(a)(2) and (b)(2)

27   because this Court is a court of competent jurisdiction and because a substantial part of the

28

COMPLAINT                                  10

1 | events or omissions alleged herein occurred in this County and in this district and throughout the

2 | State of California.

3 | ### ALLEGATIONS OF WRONGFUL CONDUCT

4 | **Summary of the Facts of this Case**

5

6 | 23. The following are the specific facts relating to each named plaintiff:

7 | Plaintiff **Florence Stean** is a 82 year old, disabled, minority homeowner who resides in Berkeley, California. She was sold an exotic high cost option adjustable rate mortgage (ARM) by at least one of the defendants without consideration of her ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that she would necessarily lose her home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

8

9

10

11

12

13 | Plaintiff **Ignatius Russo** is a minority homeowner who resides in Daly City, California. He was sold an exotic high cost option adjustable rate mortgage (ARM) by at least one of the defendants without consideration of his ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that he would necessarily lose his home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

14

15

16

17 | Plaintiff **Babatunde Michael White** is a minority homeowner who resides in Antioch, California. He was sold an exotic high cost option adjustable rate mortgage (ARM) by at least one of the defendants without consideration of his ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that he would necessarily lose his home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

18

19

20

21

22

23 | Plaintiff **Dorothy Turner** is a minority homeowner who resides in Oakland, California. She was sold an exotic high cost option adjustable rate mortgage (ARM) by at least one of the defendants without consideration of her ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that she would necessarily lose her home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

24

25

26

27

28 | Plaintiff **Ray Jefferson** is a minority homeowner who resides in Vallejo, California. He was sold an exotic high cost option adjustable rate mortgage

(ARM) by at least one of the defendants without consideration of his ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that he would necessarily lose his home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

Plaintiff **Karen Fomby** is a minority homeowner who resides in Santa Clara, California. She was sold an exotic high cost option adjustable rate mortgage (ARM) by at least one of the defendants without consideration of her ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that she would necessarily lose her home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

Plaintiff **Glenn Ancheta** is a minority homeowner who resides in Milpitas, California. He was sold an exotic high cost option adjustable rate mortgage (ARM) by at least one of the defendants without consideration of his ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that he would necessarily lose his home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

Plaintiff **Febe Natividad** is a minority homeowner who resides in Mountainhouse, California. She was sold an exotic high cost option adjustable rate mortgage (ARM) by one of the defendants without consideration of her ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that she would necessarily lose her home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

Plaintiff **Ramzy Haddadin** is a minority homeowner who resides in Concord, California. He was sold an exotic high cost option adjustable rate mortgage (ARM) by one of the defendants without consideration of his ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that he would necessarily lose his home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

Plaintiff **Marlyn Lacanlale** is a minority homeowner who resides in Santa Clara, California. She was sold an exotic high cost option adjustable rate mortgage (ARM) by one of the defendants without consideration of her ability to pay the loan's hidden maximum interest rate, which far exceeded the initial teaser rate and made the loan unaffordable. Plaintiff also was not told that she would necessarily lose her home when the teaser rate adjusted to the maximum rate barring some unforeseeable and unlikely windfall increase in income.

1

2    Plaintiff **Abraham Chua** is a minority homeowner who resides in Hayward,
3    California. He was sold an exotic high cost option adjustable rate mortgage
     (ARM) by one of the defendants without consideration of his ability to pay the
4    loan's hidden maximum interest rate, which far exceeded the initial teaser rate
5    and made the loan unaffordable. Plaintiff also was not told that he would
     necessarily lose his home when the teaser rate adjusted to the maximum rate
6    barring some unforeseeable and unlikely windfall increase in income.

7    24.    On information and belief, with respect to securitized loans, defendants either

8    initiated or threatened to initiate foreclosure sale proceedings pursuant to their alleged, and here

9    disputed, power to enforce real estate notes ("the note") secured against the borrowers' property.

10   25.    In pursuing foreclosure, defendants represented that they had the right to payment

11   under the notes, payment of which was secured by the security instruments.

12
13   26.    The true facts were that they were not in possession of the notes and they were not

14   either holders of the notes or non-holders of the notes entitled to payment, as those terms are

15   used in Commercial Code §§ 3301, 3309, and therefore they were proceeding to foreclosure

16   without authority under the law. Further, they added costs and charges to the payoff amount of

17   the notes that were not justified and proper under the terms of the notes or the law.

18
19   27.    The defendants misrepresented the facts for the primary purpose of artificially

20   inflating the value of the resulting asset-backed securities and for the secondary purpose of

21   forcing plaintiffs to pay defendants large sums of money to which they are not entitled under the

22   law.

23   28.    Many of the notes were, in fact, assigned to third parties, such that defendants

24   lack or lacked standing to initiate a foreclosure proceeding against the property.

25   29.    Defendants also had no right to direct the trustee to foreclose and sell the subject

26   property. Defendants knew or reasonably should have known that they had no right to foreclose

27   the security instruments unless and until they actually have in their possession the original notes

28

1 | properly endorsed to them or assigned to them as of the date preceding the notice of default
2 | recorded by the trustee.

3
4        30.     In order for the defendants to maintain legal standing in connection with these
5   loans, they are required to show the entire chain of title of these notes and the entire chain of title
6   of the mortgages.  They refused to do this despite numerous requests, leading plaintiffs to
7   conclude that defendants cannot produce such evidence of a complete chain of title or are
8   intentionally withholding the information that would show breaks.  *See In re Kang Jin Hwang*,
9
10  396 B.R. 757, 764-72 (Bankr. C.D. Cal. Sept. 29, 2008); *see also Stoianoff v. State of Mont.*, 695
11  F.2d 1214, 1223 (9th Cir. 1983); *Quantum Corp. v. Riverbed Tech., Inc.*, 2008 U.S. Dist. LEXIS
12  11348, *10 (N.D. Cal. 2008); and *In re Gavin*, 319 B.R. 27, 31 (B.A.P. 1st Cir. 2004).

13       31.     Defendants, in so acting, engaged in a pattern and practice of knowingly utilizing
14  the foreclosure procedures to foreclose on property despite not having the right to do so.  As
15  anticipated by defendants and necessary for their scheme, property owners generally do not have
16
17  the knowledge and means to challenge defendants' wrongful and oppressive conduct.

18       32.     Defendants also routinely engage in a pattern and practice of knowingly offering
19  substantially inferior and unaffordable mortgage products to elderly, minority and financially
20  distressed consumers with the intent of artificially inflating their earnings and without regard to
21  whether borrowers could repay the loans.  This practice has allowed defendants to artificially
22
23  inflate their profits by millions of dollars.

24       33.     In all of the wrongful acts alleged in this complaint, the defendants have utilized
25  the United States mail in furtherance of their pattern of conduct to unlawfully collect on
26  negotiable instruments when they were not entitled under the law to do so and, assuming
27  *arguendo* that they did have the right to proceed to foreclosure under the notes, to profit from
28

COMPLAINT                                    14

1    those actions in amounts greater than is legitimate.

2        34.    As a result thereof, plaintiff has been damaged by having to hire attorneys and in

3    other ways (some of which are not readily apparent at this time) including, but not limited to,

4    
5    excessive fees, interest and other unauthorized charges.

6    **Violation of the Securities Exchange Act of 1934**

7        35.    Defendants also made material misrepresentations and omissions in connection

8    with the sale of securities in violation of the Securities Exchange Act of 1934.  For instance,

9    New Century's 2005 10-K states:
10    
11       • In the event a borrower becomes delinquent, our loan counselors and
             mortgage assistant advisors *assist the borrower in addressing the reasons*
12          *for the delinquency, achieving a resolution and bringing the loan*
             *current.*
13    
14       • We do not originate loans covered by HOEPA . . . .

15    
16       36.    In fact, defendants routinely refused to discuss modifications of loans for their

17    struggling borrowers.  Moreover, many of their loans contain interest rates above 8 and 10

18    percent and typically between 12 and 15 percent.

19       37.    With respect to securitized loans, defendants conspired and took affirmative steps

20    to induce plaintiffs into a transaction that did not and could not meet normal underwriting

21    standards for a residential mortgage.  The loan seller, i.e., the initial lender, posed as a

22    conventional mortgage lender, thus leading plaintiff to reasonably believe that the loan seller, the

23    mortgage broker, and the loan originator had an interest in the success (repayment of the loan) of

24    the transaction that was being executed at the time of closing.

25       38.    In fact, contrary to defendants' representations and assurances, defendants had no

26    
27    financial stake (i.e., liability) in the transactions and no interest other than obtaining plaintiffs'
28    

COMPLAINT                              15

1  signatures on an inferior mortgage products. At all times during these transactions, defendants
2  were in the best position to determine the truth about the loans and knew or recklessly
3  disregarded the fact that the loans where generally unaffordable. This fact made them worthless
4  to even the ultimate investors in the resulting asset-backed securities.
5

6      39.    The purpose of the scheme was solely to collect fees, rebates, kickbacks and
7  profits that were never disclosed to plaintiff and to artificially inflate defendants' earnings.

8      40.    Importantly, the high cost mortgage/securitization scheme was a closely held
9  secret that could not be discovered through exercise of reasonable diligence by plaintiffs.
10  Plaintiffs only discovered the scheme pursuant to the widespread and continuing collapse of the
11  stock market and the financial services industry that resulted, substantially, from defendants'
12  predatory practices.
13

14      41.    Without the knowledge of the plaintiffs, loan sellers entered into forward sale,
15  pooling and service agreements with one or more third parties, prior to or contemporaneously
16  with the closing of mortgage transaction. Under the terms of these agreements, the loan seller
17  received a sum of money, usually on receiving an application for a loan equal to the gross
18  amount of the loan sought by plaintiff plus a fee of 2.5% or more which was allocated to the
19  subject loan transaction.
20

21
22      42.    Contrary to the documents presented before and during the closing of the loan
23  transaction, the loan seller was neither the source of funding nor the lender. Thus at the time of
24  recording, the source of funding was different than the beneficiary under the deed of trust and
25  was neither named nor disclosed in any fashion. Importantly to this action, unknown to
26  borrowers, securitized loans contained terms and conditions that were specified by the
27  undisclosed third parties rather than by the loan seller. In particular, third party lenders set
28

COMPLAINT                                        16

quotas for predatory loans containing oppressive terms (e.g., prepayment penalties, ARMs in excess of 10 percent and reaching as high as 15 percent) for the purpose inflating their value and securitizing them. Despite defendants' knowledge otherwise, borrowers were routinely told that they qualified for these loans.

43.    The resulting pool of assets were, then, sold to investors and are largely responsible for the current nationwide financial crisis.

44.    The above described wrongful acts constitute a fraudulent scheme related to the sale of securities in violations of the Securities Exchange Act of 1934.

45.    Defendants also engaged in a pattern and practice of defrauding plaintiffs in that, during the entire life of the mortgage loan, defendants failed to properly credit payments made; incorrectly calculated interest on the accounts; and have failed to accurately debit fees. At all times during the relevant period, defendants had actual knowledge that the consumers accounts were not accurate but that plaintiffs would make further payments based on defendants' inaccurate accounting practices.

46.    Plaintiffs made payments based on the improper, inaccurate, and fraudulent representations as to their accounts.

47.    As a direct and proximate result of the actions of the defendants set forth above, plaintiff overpaid in interest.

48.    Defendants also utilized amounts known to the defendant to be inaccurate to determine the amount allegedly due and owing for purposes of foreclosure.

49.    Defendants' violations were all material within the meaning of the Truth In Lending Act.

## CLASS ALLEGATIONS

50.     Plaintiffs bring this action on their own behalf and on behalf of all other persons

similarly situated. The class plaintiff seeks to represent includes:

> A declaratory relief, injunctive relief and damages class defined as all
> consumers who, during the Class Period, closed *"high cost"* real estate
> mortgages relating to their primary residences containing hidden and
> oppressive terms that made the loans unaffordable and where, because of
> the material misrepresentations and omissions, members of the class were
> threatened with or became the subjects of foreclosure by defendants,
> despite the fact that defendants, themselves, in many cases were either not
> in possession of the notes or were in possession of the notes, but otherwise
> not entitled to enforce them.

51.     Excluded from the class are defendants, any parent, subsidiary or affiliate of

defendants and all officers and directors who are or have been employed by defendants during

the Class Period.

52.     The class is sufficiently numerous and geographically dispersed such that joinder

of all members is impracticable.  Plaintiffs are informed and believe that the class includes

hundreds, if not thousands of individuals across the United States who closed loans with

defendants during the Class Period and were subsequently subject to foreclosure by defendants

despite their knowledge that the foreclosures were the result defendants false and misleading

representations and/or deceptive business practices.  Respecting securitized notes, defendants

were also uniformly aware that—if challenged—they could not establish a right to foreclose

either on their own behalf or on behalf of the actual owners of the notes. The disposition of the

class members' claims on a class-wide basis in this action will substantially benefit the parties

and the Court.  *See In re Duck*, 122 B.R. 403, 405 (Bankr. N.D. Cal. 1990) ("Bankruptcy Rule

7023 authorizes and sets forth procedure for maintaining a class action.").

53.     There is a well defined community of interest in the questions of law and fact

1    affecting the class. The questions of law and fact common to the classes predominate over

2    questions affecting only individual class members, and include, but are not limited to, the

3    following:

4

5        (a)    Whether defendants' engaged in a fraudulent scheme to reap significant

6    unearned profits by routinely transferring large numbers of real estate notes into a trust in a

7    manner and for the primary purpose of concealing the inferior quality of certain securitized notes

8    and for the further purpose of  selling those notes in-mass to thousands of unsuspecting

9    investors;

10

11        (b)    Whether, by engaging in their unlawful scheme to conceal the true quality

12    of the mortgage-backed securities they sold, defendants also furthered their overall purpose of

13    profiting from low income or credit impaired individuals by charging excessive fees and

14    usurious interest rates on real estate loans that defendants knew could never be repaid;

15

16        (c)    Whether defendants routinely and intentionally misled class members

17    about the terms, conditions and benefits of their mortgage loan products, including, but not

18    limited to, as to the long-term consequences of exotic sub-prime programs such as Interest Only

19    and Pick-A-Payment.  These and similar programs are at the heart of the nation's real estate

20    crisis;

21

22        (d)    Whether defendants acted with actual knowledge or recklessly disregarded

23    the fact that class members could not qualify for the mortgage products sold to them after the

24    teaser interest rate period ended (usually 2-5 years);

25        (e)    Whether defendants knew or had recklessly disregarded the fact that their

26    employees, agents, partners or other joint venturers (e.g., mortgage brokers) routinely

27    misrepresented to the class members that the mortgages could be  refinanced into prime

28

COMPLAINT                                                    19

1  mortgage products at the end of the teaser interest rate period, despite possessing actual

2  knowledge that the vast majority of these loans could never be converted due to, among other

3  things, fluctuating property values, credit ratings and the size of the loans (i.e., Jumbo loans

4  could not be refinanced at prime rates because they were uninsurable.);

5

6        (f)     Whether, by engaging in the wrongful conduct alleged herein, defendants

7  participated in a scheme to sell mortgage products under terms and conditions that they knew

8  class members could not perform;

9        (g)     Whether, by engaging in the wrongful conduct alleged herein, defendants

10

11  violated their duty of good faith and fair dealing;

12        (h)     Whether defendants' conduct as alleged herein constitutes a violation of

13  HOEPA;

14        (i)     Whether defendants' conduct as alleged herein constitutes a violation of

15

16  §§ 1709 and 1710 of the Cal. Civ. Code.

17        (j)     Whether defendants' conduct as alleged herein constitutes a violation of

18  California Financial Code §22302(b) and Cal. Civ. Code §1670.5;

19        (k)     Whether defendants' conduct as alleged herein constitutes a violation of

20  UCL, Cal. Bus. & Prof. Code §§17200, et seq.;

21        (l)     Whether defendants' conduct as alleged herein was willful and/or

22

23  intentional;

24        (m)     Whether defendants were unjustly enriched as a result of their wrongful

25  course of conduct as alleged herein;

26        (n)     Whether plaintiff and the members of the class are entitled to an award of

27

28  compensatory and/or punitive damages and, if so, in what amount;


COMPLAINT                              20

1          (o)    Whether plaintiff and the members of the class are entitled to restitution;

2          (p)    Whether plaintiff and the members of the class are entitled to declaratory,

3    injunctive, and/or other equitable relief;

4
           (q)    Whether defendants should be ordered to disgorge their ill-gotten gains;
5

6          (r)    Whether plaintiff and the members of the class are entitled to an award of

7    reasonable attorneys' fees, pre-judgment interest, and costs of this suit;

8          (s)    Whether defendants should be preliminarily and/or permanently enjoined

9    from pursuing non-judicial foreclosure and/or evicting class members during the pendency of
10
     this action. *See Asuncion v. Superior Court of San Diego*, 108 Cal. App. 3d 141, 146-147 (1980)
11

12   (holding that homeowners cannot be evicted until they have been permitted to raise affirmative

13   defenses which, if proved would maintain possession and ownership.).

14
          54.    Plaintiffs assert claims that are typical of the claims of the other members of the
15
     class, as all members of the class have been subjected to this same wrongful conduct and the
16

17   relief that plaintiffs seek is common to the relief sought by the class members.

18        55.    Plaintiffs will fairly and adequately represent and protect the interests of all class

19   members and plaintiffs have no interests antagonistic to or which irreconcilably conflict with

20   those of other class members. Plaintiffs are committed to the vigorous prosecution of this action

21   and have retained competent counsel experienced in litigation of this nature to represent him and

22
     the class. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.
23

24        56.    A class action is the most appropriate method for the fair and efficient

25   adjudication of this controversy. Plaintiffs and the class have suffered and will continue to suffer

26   irreparable harm as a result of defendants' unfair, unlawful, and unconscionable conduct.
27
     Because of the great number of individuals affected by defendants' conduct, it is impracticable to
28

COMPLAINT                                    21

1    seek redress on an individual-by-individual basis.  Doing so would, likely, result in duplicative

2    and wasteful litigation.  A class action is therefore appropriate, the superior method of

3    proceeding, and is essential to the interests of justice.  Absent this class action, the classes will

4

5    continue to suffer losses and the violations of law described herein will continue without a

6    practical remedy, and defendants will unjustly retain the proceeds of their ill-gotten gains.

7    Moreover, bringing mass individual actions will result in multiplicity of lawsuits that will cause

8    undue hardship and expense for the Court and the litigants and would create a risk of inconsistent

9    or varying rulings and adjudications that might, as a practical matter, be dispositive of the

10

11   interests of the other members of the class who are not parties to such adjudication, may

12   substantially impede those other class members' ability to protect their interests, and/or would

13   establish incompatible standards of conduct for defendants.

14       57.    Defendants have acted or refused to act on grounds generally applicable to the

15   class, making appropriate injunctive or declaratory relief with respect to the class.

16

17                                    **COUNT I**

18         **Declaratory Relief – Plaintiff is Entitled to Enjoin or Set Aside the Trustee Sale**
                                  **(Against All Defendants)**

19

20       58.    Plaintiffs hereby incorporate by reference the allegations contained in all

21   preceding paragraphs of this Complaint.

22       59.    Plaintiffs bring this claim individually and on behalf of the class against all

23   defendants.

24       60.    As a result of defendants' fraudulent "high cost" mortgage scheme, they are

25   unable to produce a real party in interest for the purpose of enforcing the notes.  *See See In re*

26   *Kang Jin Hwang*, 396 B.R. 757, 764-72 (Bankr. C.D. Cal. Sept. 29, 2008).  More specifically,

27

28   defendants are believed to not hold the notes in question and/or are unable to join the owners of

1    the notes to any action to enforce them.

2       61.     For these reasons, defendants' efforts to enforce the notes against the class should

3    be declared unlawful, entitling the class to a permanent or temporary injunction against future

4    efforts.

5

6                                          **COUNT II**

7            **Breach of the Implied Covenant of Good Faith and Fair Dealing**
                                  **(Against All Defendants)**
8

9       62.     Plaintiffs hereby incorporates by reference the allegations contained in all

10   preceding paragraphs of this Complaint.

11      63.     Plaintiffs bring this claim individually and on behalf of the class against all

12   defendants.

13      64.     Defendants knowingly and intentionally engaged in a scheme to conceal the true

14   nature, terms and conditions of the mortgage products they sold to the class.

15      65.     Defendants knew that the class members could not ultimately successfully

16   perform under the onerous terms of the mortgage products they sold to them.  In particular,

17   defendants knew that exotic loans contained an initial period with a manageable teaser interest

18   rate followed by multiple resets of that rate to much higher and unaffordable rates.

19      66.     Defendants' active concealment of the true unaffordable nature of these

20   mortgages made the benefits to the borrowers illusory and constitutes a breach of the implied

21   covenant of good faith and fair dealing existing in defendants' agreements with plaintiffs and the

22   other class members.

23      67.     Plaintiffs and the other class members have suffered harm as a proximate result of

24   defendants' breach of their agreements.

25      68.     Defendants are liable to plaintiffs and the class for damages sustained as a result

26   of their breach.

27                                        **COUNT III**

28

COMPLAINT                                    23

**Violation of Sections 1709 and 1710 of the California Civil Code**
**(Against All Defendants)**

69.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

70.     Plaintiffs bring this claim individually and on behalf of the class against all defendants.

71.     For the purpose of inducing plaintiffs and other class members to purchase inferior mortgages, and with intent to deceive plaintiffs and the class, defendants engaged in a deceitful pattern and practice and/or a conspiracy to defraud, as a part of which said defendants made, participated in the making of, or aided and abetted the misrepresentation that the mortgage products were affordable to plaintiffs and the class members and/or that plaintiffs and the class members could easily refinance into a more affordable loan at the end of the teaser rate period. These representations were not true and defendants knew that they were not true. Defendants' acts were fraudulent, oppressive, and malicious.

72.     Plaintiffs and the class reasonably relied on one or more of defendants' false statements alleged herein and were damaged thereby.

73.     Defendants acted maliciously, oppressively, and in bad faith when they committed the wrongful acts which constitute this cause of action such that it warrants the imposition of punitive and exemplary damages against defendants and in favor of plaintiff and the class.

**COUNT IV**

**Fraud, Deceit and Misrepresentation**
**(Against All Defendants)**

COMPLAINT                                    24

1
2      74.    Plaintiffs hereby incorporate by reference the allegations contained in all
3  preceding paragraphs of this Complaint.

4      75.    Plaintiffs bring this claim individually and on behalf of the class against all
5  defendants.

6
7      76.    Defendants' actively misrepresented that the sub-prime mortgage products they
   sold to unwitting consumers were affordable and that they could be easily refinanced.
8
9      77.    Defendants engaged in a pattern and practice of actively concealing from
10  plaintiffs and the class members material facts concerning the unaffordable nature of these
11  mortgages and the ultimate lack of substantial benefit to borrowers. In particular, defendants
12  actively concealed from borrowers that the loans were scheduled to reset multiple times,
13  eventually reaching interest rates that would be unaffordable. Defendants also *concealed the*
14  *fact that they had contractual relationships with secondary lenders for the purchase of such*
15  *loans at a premium* for the ultimate purpose of securitizing them.

16     78.    Defendants knew or should have known that material facts concerning
17  affordability and benefits of the mortgage products were unknown to plaintiffs and the class.

18     79.    Defendants misrepresented, concealed, and suppressed material facts from
19  plaintiffs and the class with the intent to defraud and with the intent to induce reliance thereon by
20  plaintiffs and the class. These misrepresentations and omissions were uniform and common to
21  the class. Had defendants disclosed the material facts concerning defendants' sub-prime
22  mortgage products to plaintiffs and the class, plaintiffs and the class members would not have
23  purchased the mortgages.

24     80.    By purchasing inferior and unaffordable subprime mortgages from defendants,
25  plaintiffs and the class relied on one or more of defendants' false statements alleged herein, and
26  were damaged thereby.

27
28

COMPLAINT                                25

81.    As a direct and proximate result of defendants' active concealment of material facts, plaintiffs and the class suffered damages in an amount within this Court's jurisdiction, to be determined according to proof at trial, with interest thereon as provided by law.

82.    Defendants acted maliciously, oppressively, and in bad faith when they committed the wrongful acts which constitute this cause of action such that it warrants the imposition of punitive and exemplary damages against defendants and in favor of plaintiffs and the class.

## COUNT V

### Violation of the Home Ownership Equity Protection Act
### (Against All Defendants)

83.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

84.    Plaintiffs bring this claim individually and on behalf of the class against all defendants.

85.    In 1994, Congress enacted the Home Ownership Equity Protection Act ("HOEPA") which is codified at 15 USC §1639, *et seq.* with the intention of protecting homeowners from predatory lending practices targeted at vulnerable consumers.  HOEPA requires lenders to make certain defined disclosures and prohibits certain terms from being included in home loans.  In the event of noncompliance, HOEPA imposes civil liability in the form of rescission and statutory damages.

86.    Plaintiffs and the other class members are "consumers" and defendants are "creditors" within the meaning of HOEPA.

87.    Plaintiffs and the other class members were required to pay excessive fees, expenses, and costs which exceeded more than 10% of the amount financed.

88.    Defendants violated HOEPA by *engaging in a pattern and practice* of extending credit to class members without regard to their ability to repay in violation of 15 USC §1639(h).

COMPLAINT                                    26

89.    In particular, defendants knowingly sold mortgages to borrowers which could never be repaid and frequently entered into *secret contractual relationships* through which secondary lenders dictated the terms of, financed, and paid a premium for "high cost" loans with unconscionable and/or unlawful terms (e.g., prepayment penalties) for the purpose of securitizing them. *Cazares v. Pac. Shore Funding*, 2006 U.S. Dist. LEXIS 1081, *22 (C.D. Cal. Jan. 3, 2006).

90.    The premium paid for high cost loans meant for securitization provided incentive to brokers, lenders and other insiders to continue a pattern and practice of deceiving consumers about the true nature of the loans.

91.    Because defendants engaged in a pattern and practice of actively concealing their secondary lending contractual relationships, plaintiffs and other members of the class were prevented from discovering defendants' violations through reasonable diligence.

92.    By virtue of the defendants' violations of HOEPA, plaintiffs and the other class members have a legal right to rescission pursuant to 15 USC §1635 and actual damages in an amount to be determined at trial, including attorney's fees.

## COUNT VI

### Violation of Financial Code Section 22302(b) and Civil Code Section 1670.5
### (Against All Defendants)

93.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

94.    Plaintiffs bring this claim individually and on behalf of the class against all defendants.

95.    Defendants actively concealed from plaintiffs and the class members material facts concerning unaffordable nature of their mortgages and the ultimate lack of substantial benefit to borrowers. In particular, defendants actively *concealed from borrowers that the loans were scheduled to reset multiple times, eventually reaching interest rates that would be unaffordable*. Defendants also concealed the fact that they had contractual relationships with

COMPLAINT                                      27

1    secondary lenders for the purchase of such loans at a premium and for the ultimate purpose of
2    securitizing them.

3        96.    The loan terms provided by defendants--in particular, the hidden terms
4    specifying that the loans would reset multiple times—are onerous to the point of being
5    unconscionable and, thus, a violation of California Financial Code §22302(b) and California
6    Civil Code §1670.5.

7        97.    Though this section has no private right of action, plaintiffs and the other class
8    members seek relief pursuant to California Business and Professions Code §17200. *See Cuzares
9    v. Pac. Shore Funding,* 2006 U.S. Dist. LEXIS 1081, *18 (C.D. Cal. Jan. 3, 2006).

10                                **COUNT VII**

11                    **Violation of California Civil Code Section 2923.6**
12                              **(Against All Defendants)**

13

14       98.    Plaintiffs hereby incorporate by reference the allegations contained in all
15    preceding paragraphs of this Complaint.

16       99.    Plaintiffs bring this claim individually and on behalf of the class against all
17    defendants.

18       100.   As a substantial result of defendants' wrongful conduct, as described herein, class
19    members have either defaulted or are certain to default on the loans when the teaser fixed interest
20    rates reset to unaffordable higher variable interest rates.

21       101.   Defendants have routinely refused to discuss modifications of these loans. When
22    defendants do modify the loans, the modifications failed to materially alter the harmful affect of
23    the current loans. Instead, defendants merely temporarily freeze the interest rates and/or tack on
24    the outstanding balance of the original loans to the end of the modified loans. As a practical
25    matter this conduct only delays the inevitable foreclosure and is intended to create the
26    appearance of compliance with consumer protection laws such as California Civil Code §2923.6.
27
28       102.   By their conduct, defendants have continued a pattern and practice of deceit and

COMPLAINT                                    28

1  have failed to comply with the requirements and legislative intent of §2923.6:

2  **§ 2923.6. (Repealed January 1, 2013) Loan modification or workout
3  plan, Legislative intent**

4  **(a)** The Legislature finds and declares that any duty servicers may have to
   maximize net present value under their pooling and servicing agreements
5  is owed to all parties in a loan pool, not to any particular parties, and that a
   servicer acts in the best interests of all parties if it agrees to or implements
6  a loan modification or workout plan for which both of the following apply:

7
   **(1)** The loan is in payment default, or payment default is reasonably
8  foreseeable.

9
   **(2)** Anticipated recovery under the loan modification or workout plan
10  exceeds the anticipated recovery through foreclosure on a net present
    value basis.
11

12  **(b)** It is the intent of the Legislature that the mortgagee, beneficiary, or
    authorized agent offer the borrower a loan modification or workout plan if
13  such a modification or plan is consistent with its contractual or other
    authority.
14

15                          **COUNT VIII**

16
                        **Violation of the UCL**
17  **California Business and Professions Code Sections 17200, *et seq.***
                        **(Against All Defendants)**
18

19
     103.    Plaintiffs hereby incorporate by reference the allegations contained in all
20
21  preceding paragraphs of this Complaint.

22      104.    Plaintiffs bring this claim individually and on behalf of the class against all
23  defendants.

24      105.    Defendants' misrepresentations and omissions of material fact made in
25
26  connection with the sale of prohibitively high interest rate mortgages constitute unlawful and
27  fraudulent business practices in violation of Cal. Bus. & Prof. Code §§17200, *et seq.* Plaintiffs
28

COMPLAINT                              29

1    and the other members of the class have suffered injury in fact and lost money or property as a

2    result of defendants' violations of law and wrongful conduct, as alleged herein.

3        106.    Defendants' conduct, as alleged in this Complaint, violates numerous California

4

5    and federal statutory and common laws:

6        (a)    Defendants' misrepresentations and omissions of material fact made in

7    connection with the sale of prohibitively high interest rate mortgages violated Cal. Fin. Code

8    §22302(b) and Cal. Civ. Code §1670.5;

9

10       (b)    Defendants' misrepresentations and omissions of material fact made in

11   connection with the sale of prohibitively high interest rate mortgages also violated the California

12   common law and Cal. Civ. Code §§1709, 1710 and 1711.

13       (c)    Defendants' misrepresentations and omissions of material fact made in

14   connection with the sale of prohibitively high interest rate mortgages also violated HOEPA,

15

16   codified at 15 USC sec. 1639, et seq.

17       107.    Plaintiffs reserve the right to allege other violations of law that constitute

18   unlawful business acts or practices based upon the above-described conduct.

19       108.    Defendants' conduct, as alleged in this Complaint, had and continues to have a

20

21   tendency to deceive plaintiffs and the other members of the class, and thereby constitutes a

22   fraudulent business act or practice.

23       109.    Any utility of defendants' "high cost" mortgage scheme is significantly

24   outweighed by the gravity of the harm that it imposes on plaintiffs and the other members of the

25   class.    Defendants' conduct is immoral, unethical, contrary to public policy, oppressive,

26   unscrupulous or substantially injurious to consumers, constituting an unfair business act or

27   practice. Defendants' conduct also threatens an incipient violation of law, including, but not

28

COMPLAINT                          30

limited to, incipient violations of: (1) Cal. Fin. Code §22302(b) and Cal. Civ. Code §1670.5; (2) Cal. Civ. Code §§1709, 1710 and 1711; and (3) 15 USC §1639, *et seq.* Defendants' conduct, furthermore, violates the policy and spirit of such laws because the effects of defendants' conduct are comparable to or the same as a violation of these laws. Additionally, defendants' conduct otherwise significantly threatens or harms plaintiff and other consumers. The injury caused by defendants' conduct: (1) was and is substantial in that it has caused harm to a large class of people; (2) was not and is not outweighed by any countervailing benefits to consumers or competition; and (3) was not and is not an injury that plaintiff or the class could reasonably have avoided because they had no reason to anticipate the impending harm or the means to avoid it, nor were they aware of potential avenues to mitigate such injury afterwards.

110. Defendants' wrongful conduct, as alleged in this Complaint, is ongoing and continues to this date.

111. Pursuant to Cal. Bus. & Prof. Code §17203, plaintiffs and the class seek an order of this Court preliminarily and permanently enjoining defendants from continuing to engage in their unlawful, unfair, and deceptive conduct as alleged herein. Plaintiffs also seek an order requiring defendants to:

(a) Immediately cease their wrongful and unlawful acts and practices;

(b) Make full restitution of all monies wrongfully obtained;

(c) Disgorge all ill-gotten revenues and/or profits; and

(d) Pay plaintiff's counsel their reasonable costs and attorneys' fees.

### COUNT IX

**Unjust Enrichment/Common Law Restitution**
**(Against All Defendants)**

COMPLAINT                                          31

1    112.   Plaintiffs hereby incorporate by reference the allegations contained in all
2  preceding paragraphs of this Complaint.

3    113.   Plaintiffs bring this claim individually and on behalf of the class against all
4  defendants.

5    114.   By soliciting business from plaintiffs and the class members with the above-
6  referenced false and misleading representations as to the quality, terms and benefits of the
7  mortgage products they sold, defendants have solicited business in violation of statutory and
8  common law. Plaintiffs and the class have suffered harm as a proximate result of defendants'
9  violations of law and wrongful conduct alleged herein.

10   115.   If defendants are permitted to keep monies collected under such illegal and
11  unconscionable conduct, they will be unjustly enriched at the expense of the class.

12   116.   WHEREFORE, plaintiffs and the class seek an order requiring defendants to:
13             (a)    Immediately cease their unlawful acts and practices;
14             (b)    Make full restitution of all monies wrongfully obtained;
15             (c)    Disgorge all ill-gotten revenues and/or profits; and
16             (d)    Pay plaintiffs' counsel their reasonable costs and attorneys' fees.
17
18                         **PRAYER FOR RELIEF**
19   117.   WHEREFORE, plaintiffs individually and on behalf of the class pray:
20           A.    For an order certifying the class, and appointing plaintiffs and their
21  undersigned counsel of record to represent the class.

22           B.    For an order declaring defendants' efforts to enforce the notes against the
23  class unlawful, entitling the class to a permanent or temporary injunction against future efforts.
24
25           C.    For a preliminary and/or permanent injunction enjoining defendants, their
26  partners, joint venturers, subsidiaries, agents, servants, and employees, and all persons acting
27  under, in concert with them directly or indirectly, or in any manner, from any way engaging in
28  the unfair, unlawful and deceptive practices set forth herein;

COMPLAINT                                  32

1          D.      For full restitution of all funds acquired from defendants' unfair business

2    practices, including disgorgement of revenues and/or profits;

3          E.      For imposition of a constructive trust upon all monies and assets

4
     defendants have acquired as a result of their unfair practices;
5

6          F.      For actual and statutory damages suffered by plaintiffs and the damages

7    class;

8          G.      For punitive damages, to be awarded to plaintiffs and each class member;

9
           H.      For both pre- and post-judgment interest on any amounts awarded;
10

11         I.      For payment of reasonable costs of suit and attorneys' fees pursuant to,

12   *inter alia*, Cal. Civ. Proc. Code §1021.5;

13         J.      For such other and further relief as the Court may deem proper.

14                              **DAMAND FOR JURY TRIAL**

15
        Plaintiff hereby demands a trial by jury.
16

17   DATED: March 24, 2009                    LAW OFFICE OF JAMES G. GILYARD

18
                                              James G. Gilyard
19                                            James G. Gilyard

20   —
                                              8 Birdsong Lane
21                                            El Sobrante, Ca  94803
                                              Telephone No.: (510) 253-3560
22                                            Fax No. (510) 779-6685

23

24

25

26

27

28

     COMPLAINT                                33