# EXHIBIT 8

MIN: 1001360-8936083000-2          Loan Number: 8936083000

## ADJUSTABLE RATE NOTE
### (MTA-Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

JUNE 23, 2006          CITY OF INDUSTRY          CALIFORNIA
[Date]                    [City]                    [State]

2381 PILOT KNOB DRIVE, SANTA CLARA, CALIFORNIA 95051
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $600,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed (ONE HUNDRED FIFTEEN PERCENT          ) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is PMC BANCORP, A CALIFORNIA CORPORATION (CFL # 60)

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.500 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the          1st          day of AUGUST, 2006 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 575/1000          percentage point(s) 3.575 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the          1st          day of each month beginning on AUGUST 1, 2006 . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JULY 1, 2036          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 17800 CASTLETON ST., #488, CITY OF INDUSTRY, CALIFORNIA 91748
or at a different place if required by the Note Holder.

Borrower Initials: _RLW_   _____  _____  _____  _____  _____

PayOption ARM Note - MTA Index
FE-5312 (0511)                    Page 1 of 4

Us53121.cv

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 2,070.72        unless adjusted under Section 3 (F).

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of AUGUST, 2007    , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to   115.000  percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**

On the   5th     Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

Borrower Initials: _Alice w._  _____  _____  _____  _____

PayOption ARM Note - MTA Index
FE-5312 (0511)                                    Page 2 of 4

U/5312.ev

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY  ** See attached Prepayment Note Addendum.**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

Borrower Initials: *R.L.W.*  _____  _____  _____  _____

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

_____ (Seal)
RUTH L. WALKER                                  -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

PayOption ARM Note - MTA Index
FE-5312 (0811)

Page 4 of 4

WITHOUT RECOURSE, PAY TO THE ORDER OF
INDYMAC BANK, F.S.B.

BY: PMC BANCORP
A CALIFORNIA CORPORATION

Jesse Feliz

Vice President

DATE:  JUNE 23, 2006
BORROWER:   RUTH L. WALKER

LOAN #:  8936083000
PROPERTY ADDRESS:   2381 PILOT KNOB DRIVE
SANTA CLARA, CALIFORNIA 95051
MIN: 1001360-8936083000-2

## PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated JUNE 23, 2006   , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by  PMC BANCORP, A CALIFORNIA CORPORATION

(the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

### BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. If I make a Partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment.

If within the first    THIRTY-SIX    months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment. I will pay this Prepayment Penalty regardless of whether I sell the Property or refinance the loan with the same Lender or Note Holder.

All other terms and conditions of the above referenced Note remain in full force and effect.

_Ruth L. Walker_ _____
RUTH L. WALKER                                              Borrower

_____
                                                           Borrower

_____
                                                           Borrower

_____
                                                           Borrower

Multistate Prepayment Penalty Addendum - (H-PPP)
FE-5201 (0412)

U65201.rw

# ALLONGE TO PROMISSORY NOTE

**Allonge to Promissory Note**

**Without recourse pay to the order of:**

RESIDENTIAL FUNDING COMPANY, LLC

By: _Soo Kim_

Name: Soo Kim

Title: President

Company: PMC BanCorp

PMCBancorp Loan #: _0936083_

Borrower Name: _Walker, Ruth Y._

Property Address: _2381 Pilot Knob Drive_
_Santa Clara Ca 95051_

Loan Amount: _600,000_

Note Date: _6/23/06_

# EXHIBIT 9

REPRESENTATION OF PRINTED DOCUMENT

# AURORA LOAN SERVICES
**www.myAuroraLoan.com**

NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

March 18, 2008

3640123048720534WEL031808
73126 0045131 010
RUTH L WALKER
2381 PILOT KNOB DR
SANTA CLARA CA 95051-1757

Re:  Homecomings Financial, LLC
Loan #
Aurora Loan Services
Loan#

Dear Customer(s):

Welcome to Aurora Loan Services. This letter is to notify you that the servicing of your mortgage loan is being assigned, sold or transferred from Homecomings Financial, LLC to Aurora Loan Services ("Aurora"), effective April 1, 2008. The transfer of your mortgage loan to Aurora includes the right to collect payments from you.

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing.

Your present servicer is Homecomings Financial, LLC. If you have any questions relating to the transfer of servicing from your present servicer call Homecomings Financial, LLC's Customer Care at 800-206-2901 between 6:00 A.M. To 10:00 P.M. Cdt on the following days Monday Through Friday. This is a toll-free number.

Beginning April 1, 2008, your new servicer will be Aurora Loan Services. The business address and toll-free telephone numbers for your new servicer are:

| Aurora Loan Services | Aurora Loan Services | Aurora Loan Services |
|---|---|---|
| Customer Service Department | Tax Department | Insurance Center |
| P.O. Box 1706 | P.O. Box 961233 | P.O. Box 2963 |
| Scottsbluff, NE  69363-1706 | Fort Worth, TX 76161-0233 | Phoenix, AZ 85062-2963 |
| 1 (800) 550-0508 | 1 (800) 550-0508 | 1 (800) 732-6578 |
| 8:00 A.M. to 11:00 P.M., ET | 8:00 A.M. to 5:00 P.M., MT | 6:00 A.M. to 6:00 P.M., MT |
| Monday through Thursday | Monday through Friday | Monday through Friday |
| 8:00 A.M. to 9:00 P.M., ET | | |
| Friday | | |
| 8:00 A.M. to 4:00 P.M., ET | | |
| Saturday | | |

If you have any questions relating to the transfer of servicing to your new servicer call the toll-free numbers listed during the business hours specified above.

The date that Homecomings Financial, LLC will stop accepting payments from you is March 31, 2008. The date that Aurora will begin accepting payments from you is April 1, 2008. Send all payments due on or after that date to Aurora Loan Services.

If you have been paying premiums for life, disability, accidental death insurance or other optional products, these policies will not transfer to Aurora. If you desire to continue your optional coverage, you can contact your optional insurance provider and discuss the possibility of directly remitting your premium to them and continuing the policy.

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605).

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to this address.

Aurora Loan Services
Attention: Customer Service Research
P.O. Box 1706
Scottsbluff, NE 69363-1706

Not later than 60 business days after receiving your request, your servicer must make any appropriate corrections to your account and must provide you with a written clarification regarding any dispute. During this 60-business-day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

Section 6 of RESPA also provides the damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that section. You should seek legal advice if you believe your rights have been violated.

Please retain this information with your loan documentation for future reference. Aurora appreciates the opportunity to provide service on your loan and for allowing us to be of service to you.

Sincerely,

***CONTINUED ON REVERSE SIDE***

Cassie Leet
Customer Service Manager

DETACH AND RETURN BOTTOM PORTION

RUTH L WALKER

| ACCOUNT NUMBER | OPTION 1 MINIMUM AMOUNT | OPTION 2 INTEREST ONLY | OPTION 3 PRIN & INT | OPTION 4 PRIN & INT-15 YR |
|---|---|---|---|---|

☐  Please check here if address, phone # or e-mail change on reverse side.

## CHOOSING YOUR PAYMENT OPTIONS

**Option 1: Minimum Amount Due –** This amount will not be sufficient to pay all accrued interest for the month or to pay loan in full over remaining term in equal monthly installments. Therefore, negative amortization will result and any deferred interest will be added to the balance of the loan.

**Option 2: Interest Only –** No reduction in your principal balance will occur with this payment.

**Option 3: Fully Amortized Payment –** Traditional payment of interest and principal. Pays all the interest due and reduces your principal in an amount sufficient to pay off your loan on schedule.

**Option 4: Accelerated Payment Option –** Payment is calculated to amortize the loan based on a 15 year term or the remaining term, whichever is less, resulting in substantial interest savings.

All funds will be applied in the following order:
(1) Interest due, (2) Principal due, (3) Escrow, (4) Fees, (5) To reduce principal balance

Include your loan number on your check.

AURORA LOAN SERVICES
ATTN: CASHIERING
P.O. BOX 78112
PHOENIX, AZ 85062-8112

Amount Enclosed     $ | | | | | | | |

INTERNET REPRINT

# EXHIBIT 10

08/18/08 09:33:32

Recording Requested By
When Recorded Mail To

Cal-Western Reconveyance Corp.
P.O. Box 22004
525 East Main Street
El Cajon CA 92022-9004

Trustee Sale No. 1157822-14

DOCUMENT:  19928821

Fees . . . . . . . . . 14.00
Taxes . .
Copies . .
AMT PAID       14.00

REGINA ALCOMENDRAS                    RDE #  011
SANTA CLARA COUNTY RECORDER           7/18/2008
Recorded at the request of            3:13 PM
Recording Service

Pages:   2

Space Above This Line For Recorder's Use

Loan No. XXXXXX8720  Ref: WALKER, RUTH L

## NOTICE OF DEFAULT

### IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice). This amount is $8,904.08 as of July 17, 2008, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC

C/O Cal-Western Reconveyance Corporation
P.O. Box 22004
525 East Main Street
El Cajon CA 92022-9004
(619)590-9200

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.

Page 1 of 2

08/18/08 09:33:33



.Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.  Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**NOTICE IS HEREBY GIVEN:**

**CAL-WESTERN RECONVEYANCE CORPORATION** is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary

under a deed of trust dated June 23, 2006 executed by

**RUTH L WALKER A WIDOW**
    as trustor, to secure certain obligations in favor of

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC AS NOMINEE FOR PMC BANCORP as beneficiary**

recorded as document 19002830 on July 06, 2006 in book XX page XX official records in the office of County Recorder of SANTA CLARA
County, California, describing land therein as:

## COMPLETELY DESCRIBED IN SAID DEED OF TRUST

said obligations including a promissory note for the principal sum of $600,000.00
that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Failure to pay the monthly payment due April 1, 2008 of principal, interest and impounds and subsequent installments due thereafter; together with all subsequent sums advanced by beneficiary pursuant to the terms and conditions of said deed of trust.

That by reason thereof the present beneficiary under such Deed of Trust has deposited with said trustee such Deed of Trust and all documents evidencing obligations secured thereby and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

T.S. 1157822-14

Dated:      July 17, 2008          CAL-WESTERN RECONVEYANCE CORPORATION


                        Signature By _EED Ahmed_
                              EED AHMED

01/03/2007 rev.                                          Nndcs.doc Page 2 of 2

# EXHIBIT 11

WHEN RECORDED MAIL TO:

AURORA LOAN SERVICES, LLC
2617 COLLEGE PARK DRIVE
SCOTTSBLUFF NE 69361-2294

TRA #   07 014
Trust No. 1157822-14
Loan No. XXXXXX8720

E 837103

MAIL TAX STATEMENT TO:

Same as above

THIS IS TO CERTIFY THAT THIS IS A FULL,
TRUE AND CORRECT COPY OF THE ORIGINAL
RECORDED IN THE OFFICE OF THE COUNTY
RECORDED ON:   March 3, 2009
AS DOCUMENT NO:   20152862   BK: / PG:
BY:    s/ Title Court Automation
CHICAGO TITLE INSURANCE CO. (LSI DIVISION)

Space Above This Line For Recorder

Documentary Transfer Tax $.00
X Grantee was/was not the foreclosing beneficiary.
consideration $484,000.00
unpaid debt $684,741.20
non exempt amount $
__Computed on the consideration or value of property conveyed.
__Computed on the consideration of value less liens or encumbrances remaining at time of sale.

Signature of Declarant or Agent
AP# 216-17-048                J. Veirs

# TRUSTEE'S DEED UPON SALE

CAL-WESTERN RECONVEYANCE CORPORATION  (herein called trustee)
does hereby grant and convey, but without covenant or warranty, express or implied to
AURORA LOAN SERVICES

(herein called Grantee) the real property in the county of SANTA CLARA ,State of California described as follows:
LOT 78, AS SHOWN UPON THAT CERTAIN MAP ENTITLED, TRACT NO 1692 OF BOWERS PARK UNIT NO. 1",
WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE COUNTY RECORDER AND MORE
COMPLETELY DESCRIBED IN EXHIBIT A
The street address and other common designation, if any, of the real property described above is purported to be:
2381 PILOT KNOB DRIVE
SANTA CLARA  CA  95051

This conveyance is made pursuant to the authority and powers vested in said Trustee, as Trustee, or Successor Trustee, or
Substituted Trustee, under that certain Deed of Trust executed by
RUTH L WALKER A WIDOW

as Trustor, recorded July 06, 2006, as Document No. 19002830, in Book XX, page XX, of Official Records in the Office of the
Recorder of SANTA CLARA County, California; and pursuant to the Notice of Default recorded July 18, 2008, as Document
No. 19928821 in Book XX, page XX of Official Records of said County, Trustee having complied with all applicable statutory
requirements of the State of California and performed all duties required by said Deed of Trust, including, among other things, as
applicable, the mailing of copies of notices or the publication of a copy of the notice of default or the personal delivery of the copy
of the notice of default or the posting of copies of the notice of sale or the publication of a copy thereof.

TDUSCA.DOC                          Page 1 of 2                          Rev. 01/14/08

TRA #    07 014
Trust No. 1157822-14
Loan No. XXXXXX8720

At the place fixed in the Notice of Trustee's Sale, said Trustee did sell said property above described at public auction on February 20, 2009 to said Grantee, being the highest bidder therefore, for $484,000.00 cash, lawful money of the United States, in satisfaction pro tanto of the indebtedness then secured by said Deed of Trust.

CAL-WESTERN RECONVEYANCE CORPORATION

Dated,   February 20, 2009

*C. Archuleta*

C. Archuleta, A.V.P.

State of California )
County of San Diego)

On   FEB 2 6 2009   before me,   Dayane Monroy
a Notary Public in and for said State, personally appeared   C. Archuleta, A.V.P.   who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

Signature _____

Dayane Monroy

(Seal)

DAYANE MONROY
Commission # 1799093
Notary Public - California
San Diego County
My Comm. Expires May 25, 2012

This document filed for recording
By Fidelity National Title Insurance and Trust
as an accommodation only. It has not been
examined as to its execution or as its effect
upon the title.

TDUSCA.DOC                         Page 2 of 2                         Rev. 01-14-08

TS. NO. 1157822-14

**EXHIBIT "A"**

LOT 78, AS SHOWN UPON THAT CERTAIN MAP ENTITLED, "TRACT NO. 1692 BOWERS PARK UNIT NO. 1", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, ON NOVEMBER 14, 1957 IN BOOK 88 OF MAPS, AT PAGES 14 AND 15.

# EXHIBIT 12

Charter No. 6947

# FEDERAL STOCK CHARTER

# LEHMAN BROTHERS BANK, FSB

SECTION 1. Corporate Title. The full corporate title of the savings bank is Lehman Brothers Bank, FSB.

SECTION 2. Office. The home office shall be located in Wilmington, Delaware.

SECTION 3. Duration. The duration of the savings bank is perpetual.

SECTION 4. Purpose and powers. The purpose of the savings bank is to pursue any or all of the lawful objectives of a Federal savings bank chartered under section 5 of the Home Owners' Loan Act and to exercise all of the express, implied, and incidental powers conferred thereby and by all acts amendatory thereof and supplemental thereto, subject to the Constitution and laws of the United States as they are now in effect, or as they may hereafter be amended, and subject to all lawful and applicable rules, regulations, and orders of the Office of Thrift Supervision ("Office").

SECTION 5. Capital Stock. The total number of shares of all classes of the capital stock that the savings bank has the authority to issue is six million (6,000,000), of which five million (5,000,000) shall be common stock of par value of $1.00 per share and of which one million (1,000,000) shall be preferred stock, par value $1.00 per share. The shares may be issued from time to time as authorized by the board of directors without further approval of shareholders, except as otherwise provided in this section 5 or to the extent that such approval is required by governing law, rule, or regulation. The consideration for the issuance of the shares shall be paid in full before their issuance and shall not be less than the par value. Neither promissory notes nor future services shall constitute payment or part payment for the issuance of shares of the savings bank. The consideration for the shares shall be cash, tangible or intangible property (to the extent direct investment in such property would be permitted), labor, or services actually performed for the savings bank, or any combination of the foregoing. In the absence of actual fraud in the transaction, the value of such property, labor, or services, as determined by the board of directors of the savings bank, shall be conclusive. Upon payment of such consideration, such shares shall be deemed to be fully paid and nonassessable. In the case of a stock dividend, that part of the retained earnings of the savings bank that is transferred to common stock or paid-in capital accounts upon the issuance of shares as a stock dividend shall be deemed to be the consideration for their issuance.

Except for shares issued in the initial organization of the savings bank or in connection with the conversion of the savings bank from the mutual to the stock form of capitalization, no shares of capital stock (including shares issuable upon conversion, exchange, or exercise of other securities) shall be issued, directly or indirectly, to officers, directors, or controlling persons of the savings bank other than as part of a general public offering or as qualifying shares to a

director, unless there issuance or the plan under which they would be issued has been approved by a majority of the total votes eligible to be cast at a legal meeting.

Nothing contained in this section 5 (or in any supplementary sections hereto) shall entitle the holders of any class or a series of capital stock to vote as a separate class or series or to more than one vote per share, except as to the cumulation of votes for the election of directors, unless the charter otherwise provides that there shall be no such cumulative voting; **Provided,** that this restriction on voting separately by class or series shall not apply:

(i)   To any provision which would authorize the holders of preferred stock, voting as a class or series, to elect some members of the board of directors, less than a majority thereof, in the event of default in the payment of dividends on any class or series of preferred stock;

(ii)  To any provision that would require the holders of preferred stock, voting as a class or series, to approve the merger or consolidation of the savings bank with another corporation or the sale, lease, or conveyance (other than by mortgage or pledge) of properties or business in exchange for securities of a corporation other than the savings bank if the preferred stock is exchanged for securities of such other corporation; **Provided,** That no provision may require such approval for transactions undertaken with the assistance or pursuant to the direction of the Office or the Federal Deposit Insurance Corporation;

(iii) To any amendment which would adversely change the specific terms of any class or series of capital stock as set forth in this section 5 (or in any supplementary sections hereto), including any amendment which would create or enlarge any class or series ranking prior thereto in rights and preferences. An amendment which increases the number of authorized shares of any class or series of capital stock, or substitutes the surviving savings bank in a merger or consolidation for the savings bank, shall not be considered to be such an adverse change.

A description of the different classes and series (if any) of the savings bank's capital stock and a statement of the designations, and the relative rights, preferences, and limitations of the shares of each class of and series (if any) of capital stock are as follows:

A.   Common stock. Except as provided in this section 5 (or in any supplementary sections thereto) the holders of the common stock shall exclusively possess all voting power. Each holder of shares of common stock shall be entitled to one vote for each share held by such holder and there shall be no right to cumulate votes in an election of directors.

Whenever there shall have been paid, or declared and set aside for payment, to the holders of the outstanding shares of any class of stock having preference over the common stock as to the payment of dividends, the full amount of dividends and of sinking fund, retirement fund, or other retirement payments, if any, to which such holders are respectively entitled in preference to the common

stock, then dividends may be paid on the common stock and on any class or series of stock entitled to participate therewith as to dividends out of any assets legally available for the payment of dividends.

In the event of any liquidation, dissolution, or winding up of the savings bank, the holders of the common stock (and the holders of any class or series of stock entitled to participate with the common stock in the distributions assets) shall be entitled to receive, in cash or in kind, the assets of the savings bank available for distribution remaining after: (i) Payment or provision for payment of the savings bank's debts and liabilities; (ii) distributions or provisions for distributions in settlement of its liquidation account; and (iii) distributions or provisions for distributions to holders of any class or series of stock having preference over the common stock in the liquidation, dissolution, or winding up of the savings bank. Each share of common stock shall have the same relative rights as and be identical in all respects with all the other shares of common stock.

B.   Preferred stock. The savings bank may provide in supplementary sections to its charter for one or more classes of preferred stock, which shall be separately identified. The shares of any class may be divided into and issued in series, with each series separately designated so as to distinguish the shares thereof from the shares of all other series and classes. The terms of each series shall be set forth in a supplementary section to the charter. All shares of the same class shall be identical except as to the following relative rights and preferences, as to which there may be variations between different series:

(a)   The distinctive serial designation and the number of shares constituting such series;

(b)   The dividend rate or the amount of dividends to be paid on the shares of such series, whether dividends shall be cumulative and, if so, from which date(s) the payment date(s) for dividends, and the participating or other special rights, if any, with respect to dividends;

(c)   The voting powers, full or limited, if any, of such shares of such series;

(d)   Whether the shares of such series shall be redeemable and, if so, the price(s) at which, and the terms and conditions on which such shares may be redeemed;

(e)   The amount(s) payable upon the shares of such series in the event of voluntary or involuntary liquidation, dissolution, or winding up of the savings bank;

(f)   Whether the shares of such series shall be entitled to the benefit of a sinking or retirement fund to be applied to the purchase or redemption of such shares, and if so entitled, the amount of such fund and the manner of

4

its application, including the price(s) at which such shares may be redeemed or purchased through the application of such fund;

(g)     Whether the shares of such series shall be convertible into, or exchangeable for, shares of any other class or classes of stock of the savings bank and, if so, the conversion price(s) or the rate(s) of exchange, and the adjustments thereof, if any, at which such conversion or exchange may be made, and any other terms and conditions of such conversion or exchange;

(h)     The price or other consideration for which the shares of such series shall be issued; and

(i)     Whether the shares of such series which are redeemed or converted shall have the status of authorized but unissued shares of serial preferred stock and whether such shares may be reissued as shares of the same or any other series or serial preferred stock.

Each share of each series of serial preferred stock shall have the same relative rights as and be identical in all respects with all the other shares of the same series.

The board of directors shall have authority to divide, by the adoption of supplementary charter sections, any authorized class of preferred stock into series, and, within the limitations set forth in this section and the remainder of this charter, fix and determine the relative rights and preferences of the shares of any series so established.

Prior to the issuance of any preferred shares of a series established by a supplementary charter section adopted by the board of directors, the savings bank shall file with the Secretary to the Office a dated copy of that supplementary section of this charter established and designating the series and fixing and determining the relative rights and preferences thereof.

SECTION 6.  Preemptive rights.  Holders of the capital stock of the savings bank shall not be entitled to preemptive rights with respect to any shares of the savings bank which may be issued.

SECTION 7.  Directors.  The savings bank shall be under the direction of a board of directors.  The authorized number of directors, as stated in the savings bank's bylaws, shall not be fewer than five nor more than fifteen, except when a greater or lesser number is approved by the Director of the Office, or his or her delegate.

SECTION 8.  Amendment to charter.  Except as provided in Section 5, no amendment, addition, alteration, change or repeal or this charter shall be made, unless such is proposed by the board of directors of the savings bank, approved by the shareholders by a majority of the votes eligible to be cast at a legal meeting, unless a higher vote is otherwise required, and approved or pre-approved by the Office.

5

ATTEST:

_____
Secretary

ATTEST:

_____
Corporate Secretary of the Office
of Thrift Supervision

LEHMAN BROTHERS BANK, FSB

By: _____
     President

OFFICE OF THRIFT SUPERVISION

_____
Scott M. Albinson, Managing Director
Office of Supervision

Effective Date: ___June 30_____, 1999

# OFFICE OF THRIFT SUPERVISION

## Order Approving Application To Establish Operating Subsidiaries

Order No.:    **2004-19**
Date:         **April 22, 2004**
Docket Nos.   **06069, H-3463, H-3497**

Lehman Brothers Bank, FSB, Wilmington, Delaware (Savings Bank), a federal stock savings bank, has filed an application with the Office of Thrift Supervision (OTS), pursuant to 12 U.S.C. § 1828(m) and 12 C.F.R. § 559.11, requesting approval to establish four operating subsidiaries. The Savings Bank proposes to acquire the following four companies from its parent holding company: ALS Holding Inc., Aurora, Colorado (ALS Holding), and its subsidiary, Aurora Loan Services, Inc., Aurora, Colorado (Aurora), and BNC Holdings, Inc., Irvine, California (BNC Holdings), and its subsidiary, BNC Mortgage, Inc., Irvine, California (BNC) (collectively, the Operating Subsidiaries). In addition, the Savings Bank has provided notice to OTS of the proposed transaction in order to claim the internal corporate reorganization exemption, set forth at 12 C.F.R. § 223.41, from certain transactions with affiliate restrictions.

**Background**

The Savings Bank is a wholly owned, direct subsidiary of Lehman Brothers Bancorp Inc. (Bancorp), which is a wholly owned direct subsidiary of Lehman Brothers Holdings Inc. (Holding Company). As of December 31, 2003, the Savings Bank had total assets of $14.2 billion, total liabilities of $13.0 billion, and total equity capital of $1.2 billion. As of such date, the Savings Bank was well capitalized, under OTS regulations,[1] with a tangible capital ratio of 8.35 percent and a total risk-based capital ratio of 13.07 percent.

The Holding Company currently owns all of ALS Holding's outstanding stock. ALS Holding, a Delaware corporation, is a shell holding company that engages in no activities other than holding all of Aurora's stock. Aurora, a Delaware corporation located in Aurora, Colorado, is a mortgage banking company.

The Holding Company currently owns 87.5 percent of BNC Holdings' stock. BNCM Acquisition Company, LCC (BNCMAC), whose members are the senior management of BNC Holdings, holds the remaining 12.5 percent. BNC Holdings, a Delaware corporation, is a shell holding company that engages in no activities other than holding all of the common stock of BNC. BNC, a Delaware corporation located in Irvine, California, is a mortgage banking company.

---

[1] 12 C.F.R. § 565.4(b)(1) (2003).

Order No.: 2004-19
Page: 2

### The Proposed Transaction

In the proposed transaction, the Holding Company will contribute the stock that it owns in ALS Holding and BNC Holdings to Bancorp, which will immediately thereafter transfer the stock to the Savings Bank. Upon consummation, the Savings Bank will own all of the common stock of ALS Holding, which will be a first-tier operating subsidiary of the Savings Bank. ALS Holding will continue to own all of the common stock of Aurora, which will be a second-tier operating subsidiary of the Savings Bank. Also, the Savings Bank will own 87.5 percent of the common stock of BNC Holdings, which will be a first-tier operating subsidiary of the Savings Bank. BNC Holdings will continue to own all of the common stock of BNC, which will be a second-tier operating subsidiary of the Savings Bank.

### Operating Subsidiary Application

Generally, a federal savings association may invest in an operating subsidiary only if: (1) the subsidiary engages only in activities permissible for federal associations to engage in directly; (2) the federal association owns, directly or indirectly, more than 50 percent of the voting shares of the operating subsidiary; and (3) no person or entity other than the federal association exercises operating control over the operating subsidiary.[2] In addition, OTS may, at any time, limit a savings association's investment in operating subsidiaries, or may limit or refuse to permit any activities of an operating subsidiary, for supervisory, legal, or safety and soundness reasons.[3]

With regard to the requirement that the subsidiary may engage only in activities permissible for federal associations to engage in directly, ALS Holding and BNC Holdings engage in no business activities other than holding the stock of their respective subsidiaries, Aurora and BNC. Aurora and BNC will engage in mortgage loan origination and servicing activities, which are permissible for federal savings associations. Accordingly, OTS concludes that the Operating Subsidiaries' proposed activities are permissible for a federal association.

With regard to the requirement that the federal association own, directly or indirectly, more than 50 percent of the voting shares of the operating subsidiary, the application indicates that each of the Operating Subsidiaries will satisfy this requirement. The Savings Bank will hold all of the common stock of ALS Holding and indirectly, through ALS Holding, own all of the stock of Aurora. In addition, the Savings Bank will hold 87.5 percent of the common stock of BNC Holdings, which owns all of the stock of BNC. OTS concludes that the Savings Bank will own, directly or indirectly, more than 50 percent of the voting shares of each of the Operating Subsidiaries. With regard to the requirement that no person or entity other than the federal association exercises operating control over the operating subsidiary, the application indicates that no other party will have operating control over the Operating Subsidiaries.

---

[2] 12 C.F.R. § 559.2, 559.3(e)(1), and (e)(1) (2003).
[3] 12 C.F.R. § 559.1(a) (2003).

Order No.: 2004-19
Page: 3

Based on its regulatory experience with the Holding Company and the Savings Bank, OTS concludes that the Savings Bank has the requisite experience and expertise to manage the Operating Subsidiaries, and OTS concludes that it has no supervisory objections to the proposed transaction, provided the conditions set forth below are satisfied.

### Transaction With Affiliates Notice

Because the proposed transfer of the stock of the Operating Subsidiaries to the Savings Bank is a covered transaction pursuant to § 23A of the Federal Reserve Act and 12 C.F.R. § 563.41, which incorporates certain provisions of the Federal Reserve Board's Regulation W, 12 C.F.R. Part 223, the application provides notice to OTS that the proposed transaction will satisfy the internal corporate reorganization exemption requirements of 12 C.F.R. § 223.41(d) and will therefore be exempt from the quantitative limits set forth at 12 C.F.R. §§ 223.11 and 223.12 and the collateral requirements set forth at 12 C.F.R. § 223.14.

The notice indicates that the proposed transaction satisfies the seven requirements for claiming the exemption, which are set forth at 12 C.F.R. § 223.4(d)(1)-(d)(7). The proposed transaction is part of an internal corporate reorganization of the Holding Company and involves the transfer of all or substantially all of the shares of the Operating Subsidiaries, which are currently affiliates, to the Savings Bank. The Savings Bank has provided written notice to OTS, before consummation of the proposed transaction, and has provided a description of the proposed business activities of the Operating Subsidiaries and the proposed date of the transaction. The Holding Company has provided a written commitment stating that it commits to either: (i) make quarterly cash contributions to the Savings Bank for two years, equal to the book value plus any write-downs on assets that become low quality during the quarter, or (ii) to repurchase on a quarterly basis for two years at a price equal to the book value plus any write-downs on assets that become low quality during the quarter. The Savings Bank's board of directors has reviewed and approved the proposed transaction.

Furthermore, based on the materials provided with the application and other materials available to OTS, OTS concludes that the value of the proposed transaction represents less than 10 percent of the Savings Bank's capital stock and surplus. The Savings Bank has not previously claimed the corporate reorganization exemption. Finally, based on its regulatory experience with the Holding Company, Bancorp, and the Savings Bank, OTS concludes that these entities are well-capitalized and well-managed and would remain well-capitalized and well-managed upon consummation of the proposed transaction. Based on the foregoing, OTS concludes that the proposed transaction satisfies the requirements for the internal corporate reorganization exemption, under 12 C.F.R. Part 563.41 and § 223.41(d).

### Conclusions

Based on the foregoing analysis and the commitments provided in the application, OTS concludes that the application meets the applicable approval criteria, provided that the following

APR 22 2004 10:48 FR SUPERVISION          2029067342 TO 82125489009          P.05

Order No.: 2004-19
Page: 4

conditions are imposed. Accordingly, the application is hereby approved, provided that the
following conditions are complied with in a manner satisfactory to the OTS Northeast Regional
Director, or his designee (Regional Director):

1. The Savings Bank and the Holding Company must receive all required regulatory approvals
   and submit copies of all such approvals to the Regional Director prior to consummation of
   the proposed transaction;

2. The proposed transaction must be consummated within six months from the date of this
   Order;

3. On the business day prior to the date of consummation of the proposed transaction, the chief
   financial officers of the Savings Bank and the Holding Company must certify in writing to
   the Regional Director that no material adverse changes have occurred with respect to the
   financial condition or operations of the Savings Bank, ALS Holding, Aurora, BNC Holdings,
   and BNC, as disclosed in the application. If additional information having a material adverse
   bearing on any feature of the application is brought to the attention of the Savings Bank, the
   Holding Company, or OTS since the date of the financial information submitted with the
   application, the transaction must not be consummated, unless the information is presented to
   the Regional Director, and the Regional Director provides written non-objection to
   consummation of the transaction;

4. The Savings Bank and the Holding Company must advise the Regional Director in writing
   within 5 calendar days after the effective date of the proposed transaction: (a) of the effective
   date of the proposed transaction; and (b) that the transaction was consummated in accordance
   with all applicable laws and regulations, the application, and this Order; and

5. The Operating Subsidiaries must not deviate materially from any of the activities, facts,
   representations or commitments described in the application, except with the prior written
   non-objection of the Regional Director.

   Any time specified herein may be extended by the Regional Director, for good cause, for
up to 120 calendar days.

   By Order of the Director of the Office of Thrift Supervision, or his designee, effective
April 22, 2004

                                        Scott M. Albinson
                                        Managing Director
                                        Examination, Supervision and Consumer Protection

** TOTAL PAGE.05 **

# SECRETARY'S CERTIFICATE

The undersigned, the Secretary of Lehman Brothers Bank, FSB, a federally chartered savings bank (the "Bank"), does hereby certify that Aurora Loan Services LLC is a wholly-owned subsidiary of the Bank.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Bank's seal this 16th day of March, 2006.

(SEAL)

Lehman Brothers Bank, FSB

Lloyd M. Winans
Secretary

## SECRETARY'S CERTIFICATE

The undersigned, the Secretary of Aurora Bank FSB, (the "Bank"), does hereby certify that on April 24th, 2009, the name of the Bank changed from Lehman Brothers Bank, FSB to Aurora Bank FSB.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Corporation's seal this 24th day of April, 2009.

SEAL                                    AURORA BANK FSB



By: _Karen Tankersley_
    Karen Tankersley
    Secretary

## SECRETARY'S CERTIFICATE

The undersigned, the Secretary of Aurora Bank FSB, (the "Bank"), does hereby certify that on April 24th, 2009, the name of the Bank changed from Lehman Brothers Bank, FSB to Aurora Bank FSB.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Corporation's seal this 24th day of April, 2009.

SEAL                                         AURORA BANK FSB



By: _Karen Tankersley_
    Karen Tankersley
    Secretary

## SECRETARY'S CERTIFICATE

The undersigned, the Secretary of Lehman Brothers Bank, FSB, a federally chartered savings bank (the "Bank"), does hereby certify that Aurora Loan Services LLC is a wholly-owned subsidiary of the Bank.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Bank's seal this 16th day of March, 2006.

*(SEAL)*

Lehman Brothers Bank, FSB

Lloyd M. Winans
Secretary